Argued May 20, affirmed July 1, petition for rehearing denied July 27, petition for review denied September 21, 1971

## STATE OF OREGON, *Respondent, v.*
## RICHARD JOHNSON, *Appellant.*

487 P2d 115

*Raymond J. Conboy,* Portland, argued the cause for appellant. With him on the brief were Pozzi, Wilson & Atchison, and Brian L. Welch, Portland.

*James P. Leahy,* Deputy District Attorney, Astoria, argued the cause for respondent. With him on the brief was Frank J. Coumont, District Attorney, Astoria.

Before Schwab, Chief Judge, and Fort and Thornton, Judges.

FORT, J.

Defendant was convicted of the crime of malfeasance in office under ORS 162.240. He assigns as sole error the trial court's denial of his motion for an order dismissing the indictment on the ground that the state had failed to prove proper venue. The case was filed and tried in Clatsop County. A statement of the facts is necessary to dispose of the venue issue.

The state's evidence established that in 1970, Klass Bros., Inc., a California concern, had a contract with the State of Oregon to paint the Astoria bridge, a major interstate bridge crossing the Columbia River at Astoria, Clatsop County, Oregon. The paint superintendent for Klass Bros., Inc., was Alfred Dreher. He was the immediate supervisor of Ronald A. Owens, who was the job superintendent on the Astoria bridge project. The defendant, Richard Johnson, was employed by the State of Oregon on the Astoria bridge job as a paint inspector.

Owens first met the defendant in Astoria around the latter part of April, 1970. Owens testified that he then believed Johnson was requiring Klass Bros., Inc., to do more work in sandblasting the bridge than the specifications of the contract required, which cost his company "extra money." Accordingly, about May 18, 1970, Owens talked to the defendant at "the Cinders" in Astoria. He testified:

"A  I simply asked Mr. Johnson that night at the Cinders that I was new in the state of Oregon and new with the State inspections and how they operated and if it was—if it was something that I

was doing, I wanted to know now so that I could do something about it.

"Q And what did he say?

"A He simply said that it was pretty simple. Before I tell you this I asked him not to beat around the bush, that I might misunderstand him, to just give it to me point-blank, and he said, 'It's very simple.' He says, 'All you have to do is pay me.'

"* * * * *

"A * * * [H]e could help us with his duties as an inspector by eliminating a coat of zinc by not forcing us to sandblast so hard, and, if I remember, he could also eliminate lots of miscellaneous inspections which he and I both knew was unnecessary. * * *"

On the following day Owens "talked to Mr. Johnson more * * * about it" at the bridge site. Owens, to establish defendant's sincerity, asked him "if he was willing to shoot me a game of pool for $100.00," and this offer was accepted. They met that night and Owens and the defendant bet $100 on an otherwise friendly game of pool being played in Astoria between Owens and one of his foremen, and Owens lost the game. Defendant pocketed the $100. When defendant next "went up to make our daily inspection, which he did every day on the sandblasting * * * it was just a matter of 10 minutes that it took him to make the inspection." Prior to that time each inspection had occupied about one and one-half hours. The defendant told Owens, as he was coming out from under the bridge, "That's a sample of how it can be."

Owens kept his supervisors notified of his conversations and activities with the defendant, and Johnson's superiors were notified by them. About May 23, 1970, the defendant's supervisor and the state district bridge engineer called on Owens regarding the matter

and shortly afterwards Owens talked to the Clatsop County district attorney.

About May 21, Owens had a further conversation with the defendant, and the defendant "in this conversation told me that he expected between five and 10 thousand dollars." Owens told the defendant "that he couldn't make these kinds of deals with me; he would have to go to somebody higher than me."

Accordingly, Owens talked to the defendant in Astoria to arrange a meeting between the defendant and Alfred Dreher for the purpose of "pay-off." Owens told the defendant that Dreher "would be flying in" from California and that an appointment could be arranged. According to Owens, the defendant "said that Dad's Restaurant in Portland would be a good spot since Al Dreher was flying in through the Portland Airport." Owens called Dreher, and Dreher, who was in Los Angeles, later called the defendant to confirm the meeting at Dad's Restaurant in Portland for May 29, 1970.

Dreher and Owens next met with the Clatsop County district attorney in Astoria on the morning of May 29, 1970, before going to Dad's Restaurant in Portland. At this meeting, Dreher, Owens, the district attorney and some state policemen were present. Five one-hundred dollar bills that had been supplied by Klass Bros., Inc., were identified and placed in a marked envelope which Mr. Dreher put into his pocket. After leaving the district attorney's office Mr. Dreher had called the defendant again to confirm the meeting.

Dreher and Owens then went to Dad's Restaurant in Multnomah County where they met defendant and sat with him in a corner booth. Police officers, dressed in civilian attire, followed Dreher and Owens into the restaurant.

According to Owens and Dreher, the defendant there demanded $7,500 for easing up on inspections. The defendant wanted half of the money immediately and half when the job was 50 per cent completed. Dreher told the defendant that he didn't carry that much money, but that he did have $500, and asked defendant if he wanted it. Defendant said yes, and Dreher gave him the envelope containing the five one-hundred dollar bills. When defendant put the envelope into his pocket Dreher took off his glasses and wiped them with a handkerchief as a signal for the police. Six officers immediately came up to the booth where the three men were sitting, arrested defendant and seized the $500 as evidence.

The indictment charged, in effect, that defendant, in Clatsop County, received $500 compensation from Alfred Dreher "for services promised in connection with" the Klass Bros., Inc.—State of Oregon contract for painting the Astoria bridge, with intent upon defendant's part "to make official inspections" of the work done by Klass Bros., Inc., under the contract "so as to produce a result favorable to the said Klass Bros., Inc." In fact the $500 was paid in Multnomah County, as stated above.

Defendant's sole claim of error is that of improper venue. Oregon Constitution, Art I, § 11. He contends that the crime was committed in Multnomah County where the $500 charged in the indictment changed hands. The state contends that under ORS 131.340, the prosecution can be brought either in Clatsop County or Multnomah County. That statute provides:

"When a crime is committed partly in one county and partly in another or when the acts or effects thereof constituting or requisite to the con-

summation of the crime occur in two or more counties, an action therefor may be commenced and tried in any of such counties."

We pointed out in *Kneefe v. Sullivan,* 2 Or App 152, 465 P2d 741, Sup Ct *review denied* (1970):

"It is important to understand the purpose of that portion of Art I, § 11 of the Oregon Constitution set forth above. *State ex rel Ricco v. Biggs,* 198 Or 413, 428, 255 P2d 1055, 38 ALR2d 720 (1953), interpreted that provision. The court there said:

" 'The constitutional protection given an accused person is divided into two parts: (1) a guarantee of "a fair and impartial trial"; and (2) a trial in the county where the crime was committed. The first guarantee is the real gist of the provision. The second is designed for the sole purpose of assuring and aiding the first; that is to say, it is an incident of the primary right to "a fair and impartial trial".'

"In *United States v. Cores,* 356 US 405, 407, 78 S Ct 875, 877, 2 L Ed 2d 873 (1958), the court said:

" 'The Constitution makes it clear that determination of proper venue in a criminal case requires determination of where the crime was committed. * * * The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place. * * *' "
2 Or App at 155-56.

In *McLemore v. State,* 241 Miss 664, 125 So 2d 86, 126 So 2d 236 (1960), *appeal dismissed* 368 US 70, 82 S Ct 197, 7 L Ed 2d 133 (1961), the defendant was convicted of offering a bribe to a public officer. The issue considered was proper venue. Mississippi had a statute, Miss Code 1942, Rec, Sec 2429, substantially identical to ORS 131.340. There the defendant had made an offer to bribe in Hinds County

and paid the money in Forrest County. He was prosecuted in the latter. His conviction in Hinds County was upheld. The court said:

> "This statute also sustains the prosecution in Forrest County. Certainly the acts, effects, means and agency occurred in part in Forrest County; and the jurisdiction was laid in that county in which the offense was consummated by the actual physical tender of the money." 241 Miss at 677.

ORS 162.240 was originally enacted by Oregon Laws 1921, ch 90, p 140. The statute has not been amended. It was entitled, "Defining malfeasance in office and providing for punishment of same." ORS 162.240 now provides:

> "(1) No officer, deputy, agent or employe, in any state, county or municipal office or as a member, agent or employe of any state board or commission, school district, or municipal subdivision of the state, county or city, shall directly or indirectly charge, take, demand, accept or receive any fee, commission, compensation, gift, reward or other consideration for services rendered or promised in connection with the purchase or sale of any bonds, warrants, supplies, material, thing or article or in connection with any contracts or awards of this state, or any county, municipality or district thereof, or from any person contracting or dealing with this state, or with any county, municipality, district or agency thereof.
>
> "(2) Any person violating this section is guilty of malfeasance in office and shall be punished upon conviction by a fine of not more than $5,000, or by imprisonment for not more than one year in the county jail or penitentiary, or both; or by dismissal from office, with or without either or any of such punishments."

We have been referred to no Oregon case, nor have we found one, construing this statute. *State v.*

*Langley,* 214 Or 445, 315 P2d 560, 323 P2d 301, *cert denied* 358 US 826, 79 S Ct 45, 3 L Ed 2d 66 (1958), involved a violation of ORS 167.515—neglect and refusal of district attorney to prosecute an alleged gambling violation. The Supreme Court, in pointing out the differences between nonfeasance, misfeasance and malfeasance, said:

> "* * * Malfeasance means evil doing, the doing of an act which is wholly wrongful and unlawful. * * *" 214 Or at 464.

In *Wallace v. State,* 211 A2d 845, 214 A2d 886 (Del 1965), the defendant, a city councilman, was convicted of malfeasance in office in that he solicited a bribe. The Supreme Court of Delaware stated:

> "* * * The thrust of the malfeasance charges stems from the solicitation, itself, as the misconduct in office, and not any wrongfully motivated vote; it stems from the *offer* to accept the bribe, and not any actual acceptance of bribe money. 'Public officers * * * are indictable for corruption if they accept or offer to accept, under color of office, any money or other benefit calculated in any way to influence their official course * * *. Nor is it necessary that any improper act on the part of the officer should follow. It is enough if he corruptly agrees to open himself to improper influences.' 2 Wharton's Criminal Law, § 1900 at pages 2236, 2237. Such is, in our opinion, the settled law in this area."① (Emphasis in original.) 211 A2d at 850.

The defendant in Clatsop County performed all of the illegal acts leading up to the actual receipt of the $500. It was there he began and continued the solicitation for a bribe. The "services promised in con-

---

① The charge to the jury in the same case is found at 214 A2d at 886.

nection with" that solicitation were both discussed and to be performed in Clatsop County. He received $100 in the form of Owens's lost "wager" in Clatsop County, and he there demonstrated by his cursory 10-minute inspection "how it could be."

We hold that on these facts on this charge, venue under ORS 131.340 properly was laid in Clatsop County. Under the statute it could alternatively have been laid in Multnomah County.

The judgment is affirmed.